IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| RODRIGO A. ORTEGA, Petitioner, | **8:20CV209** |
| vs. | |
| SCOTT R. FRAKES, Respondent. | **MEMORANDUM AND ORDER** |

Rodrigo A. Ortega (Ortega or Petitioner) has filed a petition for writ of habeas corpus and Respondent has filed a motion for summary judgment. I will grant the motion for summary judgment.

In June 2014, a jury convicted Ortega of possession of a firearm by a prohibited person, third degree attempted assault on an officer, and possession of methamphetamine. Following an enhancement hearing in which the court determined that the possession of a firearm by a prohibited person was a second offense and a determination that Ortega was a habitual criminal which qualified Ortega for sentencing enhancement on the possession of methamphetamine conviction, the district court sentenced Ortega to an aggregate sentence of 71 to 101 years' imprisonment.

The essence of Petitioner's claims is ineffective assistance of counsel. As is relevant here, the Nebraska courts found that Petitioner was not denied effective assistance of counsel. *State v. Ortega*, No. A-19-593, 2020 WL 1547063, at *1 (Neb. Ct. App., Mar. 24, 2020), Supreme Court review denied (May 26, 2020) (because there was no allegation or showing or prejudice, denying post-conviction relief because all of Ortega's assignments of error centered around his allegation that the district court erred in concluding that he did not receive effective assistance of counsel for trial counsel's failure to preserve his objections raised in his motion to suppress by failing to object and/or renew those objections during trial).

The court reasoned:

> Following our de novo review, we concur with the district court that Ortega failed to make specific allegations of prejudice in connection with his claim of ineffective assistance of trial counsel. After reviewing Ortega's motion for postconviction relief, it is clear that he claims his trial counsel was ineffective for failing to make or renew objections during trial which were originally raised in connection with his motion to suppress. His motion to suppress primarily dealt with claims that police obtained evidence from an unconstitutional, warrantless search of his vehicle. Thus, although Ortega's motion for postconviction relief was sufficient to provide the district court with notice of the alleged deficiency committed by trial counsel, it simply fails to allege in any fashion the manner or the nature and effect the alleged objections or lack thereof had on the trial or any appeal thereof. Without any allegation of prejudice, Ortega has failed to comply with the U.S. Supreme Court's statement in *Lockhart* and this court's statement in *McGurk*.

*Id*. at *3.

### *Claims*

I have previously found that Petitioner has potentially three claims that might entitle to him relief. They are:

> Claim One: Ineffective assistance of trial counsel (who apparently was also appellant counsel) for failing to preserve defendant's Fourth Amendment claims for appellate review.
>
> Claim Two: Petitioner was denied his right to be free from unreasonable searches and seizures under the Fourth and Fourteenth Amendments because the trial court failed to suppress the search of his vehicle.
>
> Claim Three: Petitioner was denied his right to effective assistance of counsel at trial because counsel failed to object to the evidence seized as a result of the unlawful search and therefore the Petitioner was denied his constitutional right to address the issue on appeal.

(Filing 18.)

### *Material Undisputed Facts*

1. Following a jury trial in 2014, Petitioner was convicted of Possession of a Deadly Weapon (Firearm) by a Prohibited Person, Second Offense, a Class IB felony, Attempted Assault on an Officer in the Third Degree, a Class I misdemeanor, and Possession of a Controlled Substance (methamphetamine), a Class IV felony, with an habitual offender

enhancement. (Filing 20-4, at CM/ECF pp. 1-4, 15-22.) The convictions were for actions Petitioner had taken on or about April 6, 2013. (Filing 20-4, at CM/ECF pp. 1-4.) The state district court subsequently sentenced Petitioner to a total of 71 to 101 years' imprisonment. (Filing 20-4, at CM/ECF pp. 20-22.)

2. Petitioner timely appealed. (Filing 20-2.) Trial counsel served as appellate counsel.

3. On appeal, Petitioner argued that the state district court had erred in denying his motion to suppress, on various grounds. (Filing 20-6.) In response, the State argued that Petitioner had failed to preserve the suppression issues for appeal by not properly objecting at trial. (Filing 20-7, at CM/ECF pp. 22-26.) In the alternative, the State argued that Petitioner's arguments failed on the merits. (Filing 20-7, at CM/ECF pp. 26-48.)

4. On July 13, 2016, in a written opinion, the Nebraska Supreme Court agreed with the State and determined that Petitioner had failed to preserve the suppression issues for appeal. (Filing 20-10.) Thus, the Nebraska Supreme Court affirmed the judgment against Petitioner without addressing the merits of his arguments. (Filing 20-10.) The Nebraska Supreme Court subsequently denied Petitioner's motion for rehearing. (Filing 20-2.)

5. The court did however examine the facts of the stop, search and seizure, and inventory in detail. It wrote:

> In his motion to suppress, Ortega claimed that the stop, search of his car, and seizure of its contents violated his constitutional and statutory rights. He also claimed that the supporting affidavit for a later search warrant rested upon information obtained because of the officers' illegal conduct. Ortega and his codefendant agreed to have their suppression motions consolidated for a hearing.
>
> At the suppression hearing, Officer Joaquin Orduno of the South Sioux City Police Department testified about stopping Ortega's car on April 6, 2013. Orduno said that he stopped Ortega's car shortly after he received dispatch that two separate callers had reported a suspicious vehicle. About an hour before Orduno made this stop, he had received a call from Detective Marty Leitru of the Sioux City Police Department in Iowa. Leitru was investigating a shooting in Sioux City that occurred two days earlier. He contacted Orduno to get a current photograph of Ortega, who was a suspect. Leitru said he had information that Ortega might be in South Sioux City with other gang members. Orduno met Leitru at the police station to obtain information about Ortega. Orduno learned that Ortega had a previous felony conviction for unlawful possession of firearm and that his Nebraska driver's license was suspended. Leitru told Orduno that the Iowa suspect had shot a person in the leg with a handgun and then fled with another person in a blue Impala with Nebraska license plates. At 1:49 a.m., Orduno sent an email out to other Nebraska officers in the area to be aware of Ortega and to use caution because he likes to carry a gun.
>
> At 2:36 a.m., while Orduno was eating dinner in his patrol car at a gas station, he received the first dispatch that a female caller had reported a suspicious car. The dispatch recording showed that the caller was a paper carrier. She

reported seeing a white male in a black car with Iowa plates driving very slowly like he was looking for something or someone. When she tried to get a better look at the driver, he rolled up his window and left. The area where she saw the car was only a few blocks from where Orduno was parked. It took him less than a minute to drive there. On the way, he received another dispatch about a suspicious car in the same area. The dispatch recording showed that a male caller reported seeing a small sports car with a spoiler. It had been parked in front of the man's house but was driving slowly around the park when he called.

While Orduno was driving east through the residential area, he saw another car one block to the south that was moving in the same direction. He said that the neighborhood was quiet and he did not see any other vehicles. So he drove at a high rate of speed – one block east and one block south – to intercept the car. By the time the car reached the next intersection traveling east, Orduno was at the stop sign facing south so that he could see the car as it passed in front of his patrol car. Orduno said that as he approached this intersection, he could see that the car had traveled left of the street's center for about 50 feet. Orduno said there were no parked cars or obstructions that could have caused a change in course and that the driver corrected course as it passed Orduno's police car.

The car was a dark blue Impala with a spoiler and Iowa license plates. Investigators later learned that the Iowa plates did not match the vehicle. Orduno said he considered the Impala to be a small sports car. Orduno admitted that even if he had not seen the Impala cross the centerline, he would have found a reason to pull it over: "I always try to find my own probable cause to stop a vehicle after somebody calls it in." He denied that he suspected the car was the Impala that Leitru was looking for because he did not "put two and two together."

Orduno began following the car, which turned right and pulled into a driveway. At that point, Orduno turned on his emergency lights and stopped. As he was walking to the driver's car window, he saw a television in the back seat, which he thought was abnormal for that time of night. He immediately recognized the driver as Ortega and told Ortega and the passenger to show their hands. Orduno said he intended to arrest Ortega for driving with a suspended license. The passenger, whom Orduno later identified as Leonard De La Rosa, placed his hands on the dashboard. Ortega started taking his gloves off, and Orduno was concerned that Ortega might have a gun. Orduno said Ortega kept asking why he was being stopped and moved his hand toward his right hip.

About this time, Officer Nelson arrived separately and walked over to stand behind Orduno. Orduno told Nelson that Ortega was dangerous, a suspect in a shooting, and "needed to go," which he said meant that Ortega was "under arrest." He also said that Ortega had a gun. Orduno told Ortega that he was under arrest for driving under a suspended license and to step out of the car and turn around. Ortega did not get out until Orduno reached in to grab him. Because Ortega kept arguing that he had not done anything, Nelson "tased" him in the chest, knocking Ortega to the ground. Orduno put one handcuff on him, but Ortega broke free and began to struggle with Orduno, in and out of the camera's view. At some point, Ortega yelled something in Spanish to De La Rosa, which phrase Orduno interpreted to be a slang command for De La Rosa to give Ortega the gun. A deputy officer who had arrived (98) put De La Rosa in the back of his truck. Meanwhile, Orduno and Nelson subdued and handcuffed Ortega. Orduno did not find any contraband or weapons in Ortega's pockets.

After the officers put both men in police vehicles, Orduno told Nelson that Ortega was a suspect in the Iowa shooting. Nelson said that because of the numerous items

in the car, they also suspected that the men were involved in a burglary. By this time, four additional officers had arrived. Officer Grace found a handgun a few feet from the passenger door. Orduno said that the officers started "processing" the car because they intended to tow it and believed that there could be evidence in the car. Grace said that his sergeant instructed him to go ahead and start a search but not to touch anything important. Orduno searched the passenger side of the car, and Grace searched the driver's side. Orduno said they were looking for "contraband, weapons, any evidence of a crime." Grace found a handgun between the two front seat cushions but did not remove it. Nelson found a substance that he believed to be methamphetamine in a bag in the backseat.

After Grace found the gun, the officers stopped searching and called Investigator Backman so he could take photographs and document the evidence they had found. Backman testified that he was called to process the evidence for investigative purposes. He seized items that appeared to be contraband, evidence of a crime, or the fruits of a crime. He said that the form he used to list the evidence was not an inventory form to list the contents of towed vehicles. He thought Grace was probably completing a separate inventory form. Grace said he was assisting Backman. Grace said that after Backman photographed and collected the evidence, he completed an inventory form. But he said that neither he nor anyone in the department had been able to find the form.

Regarding the police department's policy on inventory searches, Orduno said that if the police towed a vehicle, he had to inventory its contents to ensure they were accounted for when it was released. He said there were forms to complete and a protocol to follow. But he said that the department had no written policy for inventorying the contents of a vehicle. Nelson and Grace also said an inventory search was mandatory for any towed vehicle.

> Orduno said that if someone is arrested for a traffic violation, the police department's known, but unwritten, policy was to tow the vehicle. Orduno said the department's policy gave an officer discretion whether to issue a citation or arrest a person who was driving under a suspected license. He said in this circumstance, he would not tow a vehicle only if a driver had children inside and no one could care for them. He said he would not have turned the vehicle over to De La Rosa even if Ortega had complied with his instructions. Orduno admitted that the officers were not completing an inventory form when they initially searched the car to look for evidence and found the gun. He could not remember whether he told any officer that the vehicle was going to be towed.

(Filing 20-10, at CM/ECF pp. 2-7.)

6. The court also examined the ruling of the district judge. The court wrote:

> After the hearing, the court overruled Ortega's motion to suppress the seized evidence. It noted that Ortega's vehicle looked black in the dark and concluded that the callers' descriptions of the suspicious car were close enough to Ortega's car to create a reasonable suspicion for an investigatory stop. It also found Orduno's testimony about Ortega's traffic violation to be credible, giving Orduno probable cause to stop Ortega's car.
>
> The court also concluded that Orduno had probable cause to arrest Ortega because Orduno recognized Ortega from his research earlier that night and knew that Ortega's license had been suspected. The court concluded that the automobile exception to the Fourth Amendment's warrant requirement applied because there was probable cause to believe that the vehicle contained a gun and other evidence of a crime in the car. The court noted the presence of a large television in the backseat and Ortega's wearing of

> gloves in April and his furtive behavior when Orduno directed him to show his hands. It also credited Orduno' s testimony that Ortega had asked De La Rosa to give him a gun while he was struggling with Orduno. And it noted that an officer had found a gun a few feet from the car. It concluded that because the officers had probable cause to search, they could search the entire vehicle, including packages within the vehicle. Additionally, the court concluded that under the police department's unwritten policy, the officers had the right to perform an inventory search of the vehicle following Ortega's arrest.

(*Id.*, at CM/ECF pp. 8-9.)

7. On April 21, 2017, Petitioner filed a meandering motion for post-conviction relief in the state district court. (Filing 20-5, at CM/ECF pp. 1-72.) In his motion, Petitioner argued, among other things, that he had received ineffective assistance of counsel based on his trial counsel's failure to properly object at trial and thereby preserve the suppression issues for appeal. (Filing 20-5, at CM/ECF pp. 32-71.) However, an examination of the post-conviction pleading indicates that there is no showing of or even an allegation of any legal prejudice sufficient to invoke a right review.

8. The state district court denied Petitioner's motion for post-conviction relief without an evidentiary hearing in a thoughtful 26-page opinion. (Filing 20-5, at CM/ECF pp. 73-109.) With respect to the claims that his trial counsel had been ineffective by failing to properly object at trial and thereby preserve the suppression

issues for appeal, the state district court determined that those claims had not been sufficiently alleged. (Filing 20-5, at CM/ECF pp. 105-06.) Indeed, the pleading was inadequate as there was absolutely no showing or allegation or prejudice. (E.g., Filing 20-5, at CM/ECF pp. 32-34.)

9. Petitioner timely appealed. (Filing 20-3.) He had separate counsel. (Filing 20-8.)

10. On appeal, Petitioner argued that the state district court had erred in denying his motion for postconviction relief without an evidentiary hearing on his claims that his counsel had been ineffective for failing to properly object at trial and thereby preserve the suppression issues for appeal. (Filing 20-8.) In response, the State argued that there was no error because Petitioner's allegations in his motion for postconviction relief were both insufficiently alleged and affirmatively refuted by the record. (Filing 20-9.)

11. On March 24, 2020, in a written opinion, the Nebraska Court of Appeals agreed with the State and determined that Petitioner's allegations in his motion for postconviction relief were insufficiently alleged, in that there were no allegations of prejudice from his trial counsel's alleged deficient performance. (Filing 20-11.) Thus, the Nebraska Court of Appeals affirmed the judgment against Petitioner without addressing the merits of his arguments. (Filing 20-11.) The

Nebraska Supreme Court subsequently denied Petitioner's petition for further review. (Filing 20-3.)

12. On July 9, 2020, Petitioner filed his amended habeas petition in this court. (Filing 15.) On July 10, 2020, this court entered an order that required Respondent to file a motion for summary judgment or state court records in support of an answer. (Filing 18.)

***Analysis***

I agree with Respondent that this case is easily resolved. Even if one were to overlook the procedural default in failing to properly alleged the ineffective assistance of counsel claim in the post-conviction proceeding--the failure to allege and show prejudice regarding the suppression issue--the record is simply overwhelming that the stop, arrest, search, seizure and inventory of the car were perfectly legal. Besides, Petitioner had a full and fair opportunity to litigate those issues thus precluding review of the merits by me. *See Stone v. Powell*, 428 U.S. 465, 481-82 (1977) (Where state had provided opportunity for full and fair litigation of Fourth Amendment claim, state prisoner could not be granted habeas corpus relief on grounds that evidence obtained through unconstitutional search and seizure was introduced at his trial, in that, in this context, contribution of exclusionary rule, if any, to effectuation of Fourth Amendment was minimal as compared to substantial societal costs of applying rule.)

But, I cannot, and do not, ignore the Nebraska pleading rules. The Nebraska court carefully reviewed the pleadings. It concluded that "[b]ecause Ortega's motion for postconviction relief failed to allege prejudice, the district court did not err in denying his motion for postconviction relief without an evidentiary hearing on his claim of ineffective assistance of counsel." (Filing 20-11, at CM/ECF p. 9.)

In short, it is not my job to enforce Nebraska procedural rules where, as here, there is no fundamentally unfair or inconsistent application of those rules. *See, e.g.*, *Hunt v. Houston*, 563 F.3d 695, 703 (8th Cir. 2009) ("To reconsider whether a default actually occurred would be to second-guess the Nebraska Supreme Court on a question of state procedural law. '[F]ederal courts do not look at whether state courts have correctly applied their own procedural rules.' *Clemons v. Luebbers*, 381 F.3d 744, 751 (8th Cir. 2004).")

Finally, a petitioner cannot appeal an adverse ruling on his petition for writ of habeas corpus under § 2254 unless he is granted a certificate of appealability. 28 U.S.C. § 2253(c)(1); 28 U.S.C. § 2253(c)(2); Fed. R. App. P. 22(b)(1). The standards for granting certificates of appealability (1) where the district court reaches the merits or (2) where the district court rules on procedural grounds are set forth in *Slack v. McDaniel*, 529 U.S. 473, 484-485 (2000). I have applied the appropriate standard and I have determined that Ortega is not entitled to a certificate of appealability.

IT IS ORDERED that this case is dismissed with prejudice. The motion for summary judgment (Filing 19) is granted. No certificate of appealability has been or will be issued. I will enter judgment by a separate document.

Dated this 30th day of October, 2020.

BY THE COURT:

Richard G. Kopf

Richard G. Kopf
Senior United States District Judge